FILED

2015 Jul-21 PM 03:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **Tammy Michelle Edwards,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | **2:14-CV-01173-KOB** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On March 28, 2011, the claimant, Tammy Edwards, applied for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act.  (R. 149-156). In both applications, the claimant alleged disability beginning January 1, 2008 because of bipolar disorder with psychotic tendencies, mood disorder, depression, anxiety, panic attacks, fatigue, a feeling of fear, and discomfort in public. (R. 94, 149-156). The Social Security Administration denied both claims on June 16, 2011. (R. 82-87). On July 6, 2011, the claimant filed a timely request for a hearing before an Administrative Law Judge. (R. 96-98). The ALJ held a video hearing on October 15, 2012. (R. 20).

In a decision dated October 25, 2012, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, therefore, was ineligible for disability insurance benefits and supplemental security income. (R. 36). On April 17, 2014, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the

Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court reverses and remands the decision of the Commissioner to the ALJ for reconsideration.

## II. ISSUE PRESENTED

Whether the Appeals Council erred by failing to remand the case to the ALJ for reconsideration after the claimant presented new and material evidence.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if she applied the correct legal standards and if substantial evidence supports the factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker,* 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo.* The court will affirm factual determinations that substantial evidence supports. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions...but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that

would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d).

Whether the claimant meets the listing and qualifies for Social Security disability benefits is a

question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or

substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210

(11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of

certain facts, the court has no power to reverse that finding as long as substantial evidence in the

record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the

[Commissioner]'s factual findings." *Walker,* 826 F.2d at 999. A reviewing court must not look

only to those parts of the record that support the decision of the ALJ, but also must view the

record in its entirety and take account of the evidence that detracts from the evidence relied on by

the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. §423(d)(1)(A), a person is entitled to disability benefits when the person

cannot "engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months...". 42 U.S.C.

§423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential

evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments
> set forth in 20 C.F.R. pt. 404, subtpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

When a claimant requests an appeal of the ALJ's decision and submits new evidence to the Appeals Council, the Appeals Council is required to evaluate the entire record including "new and material evidence submitted to it if [the new evidence] relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b); *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994). If the Appeals Council denies review, the evidence is part of the administrative record that goes to the district court for review. *Id.* at 1067.

"When a claimant takes issue with the adequacy of Appeals Council's evaluation of new evidence, the district court may properly review the new evidence to see whether it is of a type the Appeals Council should consider." *Fry v. Massanari*, 209 F. Supp. 2d 1246, 1252 (N.D. Ala. 2001) (*citing Keeton*, 21 F.3d at 1067-1068). The district court may determine that the failure of the Appeals Council to adequately consider that evidence warrants a remand. *Flowers v. Comm'r of Soc. Sec.*, 441 F. App'x. 735, 745 (11th Cir. 2001) (*quoting Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987). New evidence is considered material and potentially worthy of remand if a reasonable possibility exists that the new evidence would change the administrative outcome. *Id.* This court has the authority to remand a case based on such evidence pursuant to 42 U.S.C. § 405(g), under a sentence four remand or reversal. *See* 20 C.F.R. §§ 404.940, 404.946.

4

When a claimant contends that the Appeals Council failed to evaluate evidence proffered, the claimant must establish that the evidence is new, material, and relates to the time period on or before the ALJ rendered his decision. *Fry*, 209 F. Supp. 2d at 1253 (citing 20 C.F.R. 404.970(b)). "'Materiality,' as required by the Social Security Act for evaluation of new evidence, means that the new evidence is 'relevant and probative so that there is a reasonable possibility that it would change the administrative outcome.'" *Id.* (*quoting Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986)).

## V. FACTS

The claimant was thirty-three years old when the ALJ issued the administrative decision. (R. 17, 149). She has a GED and her past relevant work experience includes employment as a server/waitress, cashier, housekeeper, receptionist, and a hostess. (R. 46-48, 207). The claimant alleged that she was disabled because of bipolar disorder, mood disorder, bipolar disorder with psychotic tendencies, depression, anxiety, panic attacks, "a feeling of impending fear," and because she "feel[s] nervous and scared to leave [her] home," "[does] not feel comfortable going into public places," and "can not [*sic*] seem to remember anything." (R. 206).

### *Physical Limitations*

Although the claimant primarily alleged mental limitations, as discussed below, she alleged that her disabilities caused physical limitations at times. On May 13, 2011 in her disability report, the claimant alleged fatigue and stated that because of this fatigue, some days she has no energy to get out of bed, shower, or get dressed. (R. 206, 213-14). On June 1, 2011, the Social Security Administration contacted the claimant regarding these allegations of fatigue, and the claimant stated that the fatigue was brought on by her bipolar disorder. (R. 250). On June 11,

5

2011, the claimant saw consulting psychologist Dr. Robert Kline, and Dr. Kline described the claimant's energy level as a four on a scale of one-to-ten. (R. 309).

*Mental Limitations*

On May 13, 2011, the claimant stated in her disability report that she first began experiencing the alleged anxiety, panic attacks, depression, fatigue, fears, discomfort, forgetfulness, and mood swings in 2004, but she did not give a specific date. She stated that in February of 2004, she began seeing psychiatrist Dr. Armand Schachter, her treating physician, but the record contains no record of visits to Dr. Schachter or any other medical treatment prior to June 2005. (R. 205-12).

On June 6, 2005, the claimant's mother took the claimant to the Brookwood Medical Center Emergency Room after the claimant attempted suicide by overdosing on Xanax and Risperdal. Dr. Joseph Hudson attended to the claimant upon her arrival to the emergency room and diagnosed her with bipolar disorder with suicidal ideation. The claimant's toxicology screen showed the presence of benzodiazepine, but her laboratory report indicated a low lithium level consistent with medication noncompliance. Following the claimant's emergency room examinations, Dr. Hudson admitted her to the Intermediate Medical Care Unit at Brookwood Medical Center. (R. 289-91).

On June 22, 2005 Dr. Schachter completed a mental status evaluation of the claimant that came back entirely normal with no suicidal ideation, a positive mood, full range affect, good judgment, good insight, and a Global Assessment of Functioning score of ninety. Dr. Schachter reported that the claimant had responded well to psychotropic medication and a structured environment and was ready for discharge. He discharged the claimant with orders to follow up

6

with him the following week. (R. 287-88).

Records from Dr. Schachter's office indicate that the claimant did not show up for the follow-up visit and failed to show for at least four visits total in 2005. The claimant did show up for a visit on August 8, 2005, and during this visit, Dr. Schachter prescribed Risperdal, Xanax, Abilify, and Wellbutrin. The claimant did not show up for her next appointment but returned on October 10, 2005, reporting severe anxiety. She admitted, however, that she had been noncompliant with her medication prior to this visit. The claimant did not see Dr. Schachter again until about six years later on May 8, 2011. (R. 28, 305-07).

On March 29 and April 20, 2007, the claimant visited Dr. Charles Lichty concerning her alleged impairments. Dr. Lichty is a specialist in internal medicine who was one of the claimant's treating physicians until the claimant moved away from the area. Notes from these visits are minimal, but they indicate that on the April visit, Dr. Lichty prescribed the claimant Xanax and Cymbalta for her anxiety. (R. 281-84).

On January 17, 2008, the claimant saw a new treating physician, Dr. Elizabeth Stevenson, at MedHelp, P.C. During this visit, the claimant reported anxiety and worry but admitted that she had been noncompliant with her medications for six months. (R. 29). Dr. Stevenson prescribed Xanax and Effexor to the claimant, and on January 28, 2008, the claimant called Dr. Stevenson and reported that the Xanax was "working great." At this time, Dr. Stevenson noted that she wanted to lower the claimant's prescription to half dosage if possible. On February 4, Dr. Stevenson renewed the prescription for Xanax, but on February 7, the claimant reported to Dr. Stevenson that the Xanax was not working as well as it had been previously, and Dr. Stevenson subsequently wrote a prescription for an increased dosage. Records indicate that Dr. Stevenson

7

refilled the claimant's prescriptions of Xanax and Effexor on February 18, 2008, over the phone. (R. 344-51).

On February 20, 2008, the claimant visited Dr. Stevenson in her office a second time, and notes from this visit indicate that the Effexor was "doing great." Dr. Stevenson added a prescription for Nexium on this visit. (R. 343). Notes from a March 17 phone call from the claimant to Dr. Stevenson indicate that the claimant quit taking Xanax because it upset her stomach, but on April 8 the claimant requested a refill on Xanax once again. Following the April 8 phone call, Dr. Stevenson refilled prescriptions for Xanax on May 1 and July 2, 2008; Effexor on May 1, May 27, and June 18, 2008;[1] and Nexium on May 27, 2008. (R. 334-40).

On July 8, 2008, the claimant visited Dr. Stevenson for the third time. Notes from this visit are sparse but indicate that the claimant's mood had improved. Dr. Stevenson continued prescriptions for Effexor and Nexium and replaced Xanax with Klonopin. Two days later, the claimant called Dr. Stevenson and stated that the Klonopin was not working; Dr. Stevenson told the claimant that she would prescribe Ativan instead. On July 14, the claimant called Dr. Stevenson and asked to switch from Klonopin back to Xanax. Notes from this call also reveal that the claimant told Dr. Stevenson that she did not want to see a psychiatrist because "he puts her [on] too much stuff." The notes also indicated that the Effexor worked well. On August 8, Dr. Stevenson again prescribed Xanax, but on August 12 the claimant's mother called Dr. Stevenson to request that she stop prescribing the claimant Xanax because the claimant was abusing the drug. The claimant had overdosed on Xanax on August 12, 2008, "hoping to not wake up." (R. 329-33).

---

[1] The June and July 2008 prescriptions for Effexor changed from Effexor to Effexor Xr.

On August 12, 2008, the claimant's mother took the claimant to the Brookwood Medical Center Emergency Room following the claimant's overdose. Dr. Steven Real saw the claimant in the emergency room and diagnosed her with depression and suicidal ideation. He admitted her to psychiatry. (R. 303).

While at Brookwood, she saw Dr. Joseph Lucas, a psychiatrist. Following a mental status examination, Dr. Lucas reported that the claimant was overwhelmed, distressed, "very depressed, very anxious, very irritable, and very hopeless." The claimant admitted to not seeing a psychiatrist regularly for about four years. Dr. Lucas diagnosed the claimant with major depressive disorder, severe, recurrent, and with generalized anxiety disorder, and he gave her a thirty on a Global Assessment of Functioning. (R. 300-02).

The claimant remained at Brookwood for thirteen days, and during her hospitalization, Dr. Lucas noted that she was "very anxious, very irritable, and noteworthy for her drug seeking." She responded positively to medication, but kept asking for more Ativan. Dr. Lucas had a meeting with the claimant and her family, during which the family stated that the claimant had abused Ativan, Xanax, and Ambien for some time. Based on this information, Dr. Lucas had the claimant detoxified during her stay at Brookwood. Dr. Lucas discharged the claimant from Brookwood on August 25, 2008, with a discharge diagnosis of major depressive disorder, severe, recurrent; generalized anxiety disorder; sedative hypnotic abuse; and histrionic and borderline personality features. Upon discharge, Dr. Lucas prescribed the claimant Seroquel, Paxil, and Nexium (R. 299-302).

Dr. Lucas ordered the claimant to follow up with him at Chilton Shelby Mental Health Center (CSMHC), but CSMHC records reveal that the claimant only visited the clinic once in

2008 and did not return until February 27, 2012. (R. 301, 370).

On February 27, 2011, the claimant once again visited the Brookwood Medical Center Emergency Room stating that she wanted to kill herself and that she had been trying to access her family's gun at home. During this visit to Brookwood, Dr. Schachter treated the claimant. He diagnosed her with major depression with chronic exacerbation, alcohol withdrawal, alcohol dependence, benzodiazepine withdrawal, benzodiazepine dependence, borderline personality disorder, and histrionic personality disorder. His notes indicate that the claimant failed to follow up on mental health treatment and had not been taking medication for eight months. The claimant reported that she began using alcohol and marijuana to self-medicate when she ran out of her medication. (R. 292-297).

The claimant stayed at Brookwood for eight days undergoing treatment and medication to which she responded well. She was discharged on March 7, 2011, following an entirely normal mental status examination. The claimant's discharge diagnoses included only recurrent major depression, recurrent, acute exacerbation, in remission. Upon discharge, Dr. Schachter continued the claimant on Effexor, BuSpar, and Prilosec and ordered her to avoid alcohol and drugs and follow up with AA, NA, and CA and to follow up with him. (R. 292-297).

The record contains no indication that the claimant followed up with any AA, NA, or CA programs. Records from Dr. Schachter's office indicate that the claimant followed up with him once on May 8, 2011. (R. 305).

On May 13, 2011, the claimant filled out her disability report, alleging the mental impairments as mentioned above. (R. 205-12). In her function report on May 13, 2011, the claimant stated that on good days she did laundry, cleaned the house, and did light yard work, but

that, on bad days, she did not feel like getting out of bed, showering, or getting dressed. She stated that on her bad days she could not stand to be around anyone, had high anxiety, and did not like to talk on the phone. In addition, she reported that, at times, she had trouble remembering things in conversations and that she could engage in small talk but not long conversations because she lost concentration. She also stated that she forgot instructions if they were not written down. She reported unusual fears that she would "ruin [her] children's lives" and also stated that she frequently felt nervous or scared but did not know why. (R. 213-20).

On May 13, 2011, the claimant's sister, Jennifer McLaughlin, filled out a third party function report in which she supported the claims that the claimant made in her disability report. McLaughlin also reported that the claimant had panic attacks and anxiety at the thought of going somewhere alone, that she needed to be reminded when it was her weekends to have her children, and that she could not follow or remember instructions very well. In addition, McLaughlin reported that the claimant did not get along well with authority figures, could be ill tempered, and did not handle stress well. McLaughlin stated that the claimant had been on and off medication for years, explaining that it was difficult for the claimant to stay on medication consistently because of her lack of health insurance. (R. 221-31).

McLaughlin attached a personal letter to the third party function report. In this letter, she stated that the claimant's doctor told the claimant's mother that the claimant had the mental state of a teenager. McLaughlin also wrote that, at times, the claimant became so depressed that she stayed in bed for days without bathing. She stated that the claimant could not hold down a job because "she can't hold it together and show up for work." According to McLaughlin, the claimant's doctor advised her not to work, but McLaughlin did not identify this doctor by name.

11

(R. 232-36).

On June 11, 2011, the claimant underwent a consultative psychological evaluation performed by clinical psychologist Dr. Robert Kline. She told Dr. Kline that she was applying for disability benefits because she was "moody," explaining that some days she felt normal and some days she felt like she did not want to see anyone or talk to anyone. She denied having any other problems. She informed Dr. Kline about her admission to Brookwood Medical Center and told him that it had occurred because she had quit taking her medication, but she claimed that she was back on her medication and doing well. The claimant reported a good appetite; stated that she slept five to seven hours each night; denied suicidal ideation; and denied memory or concentration problems. She reported two or three crying spells per month. Dr. Kline rated her energy level as a four out of ten. The claimant reported that she did not drink anymore and had quit using marijuana. When Dr. Kline asked her why she had quit working in January 2011, the claimant did not give an answer. (R. 309-10).

Dr. Kline's mental status examination resulted in generally normal findings, although the claimant did claim that she was very uncomfortable in public situations because "you never know what will happen." Dr. Kline reported that the claimant did not meet the DSM-IV criteria for a diagnosis of major depression at that time, because her medication kept her depression under control. However, Dr. Kline reported that the claimant did have some social phobia. He diagnosed her with a mild restriction of activities, a mild constriction of interests, and a mild restriction in the ability to relate to others. Regarding working ability, Dr. Kline reported that the claimant had adequate ability to function independently, understand, carry out, and remember instructions, and to respond appropriately to supervision, co-workers, and work pressures in a work setting, noting

12

only that she may have difficulty in a setting with a lot of people. (R. 309-10).

On June 16, 2011, State Agency psychiatric consultant Dr. Samuel Williams completed a "Psychiatric Review Technique" form. Based on the then available record, Dr. Williams concluded that the evidence did not support a finding of any severe mental impairment as defined by the regulations. He diagnosed the claimant with a mild limitation in social functioning, no limitations in daily activities, and no limitation in maintaining concentration persistence or pace. (R. 311-24).

On January 10, 2012, the claimant presented at Brookwood Medical Center again, where Dr. Kraig Johnson saw her, reporting that the claimant was upset and could not stop crying, but he noted that she denied suicidal ideation. His report stated that she had been in work release because of unpaid fines from a 2008 DUI conviction and that she had a problem with her medications while she was in work release. Dr. Johnson attributed the claimant's breakdown to the problems with her medication. He offered the claimant admission to the hospital, but she told him that she just wanted to calm down, try to sleep, and get her medication corrected. She was given a shot of Ativan and returned to her work release program later that day. (R. 325-27).

On February 27, 2012, the claimant began visiting Chilton Shelby Mental Health Center (CSMHC) again where she was seen by licensed professional counselors Christine Snead and Jade Witt. During her intake, the claimant reported that she had a long history of depression and anxiety, citing much of the above history, and she stated that she wanted to continue her medication and treatment. The report lists the claimant's then current medications as Effexor XR, Haldol, Trazadone, and Visteril, and the claimant reported that she was currently compliant with her medication. However, she was unable to state the name of her prescribed medications, unable

13

to remember the medication dosage, and unable to describe the purpose of the medication. The records also indicate that the claimant did not keep all of her mental health treatment appointments. (R. 364-71).

The summary of the claimant's February 27, 2008 visit to CSMHC revealed that her mental status was completely normal, consistent with past reports when the claimant had complied with her medication. Counselors Snead and Witt recommended that the claimant participate in individual therapy one to five times per year, group therapy once a month, physician assessment two to six times per year, case management one to six times per month, and medication monitoring one to five times per year. Despite these recommendations, the record contains no indication that the claimant participated in such therapy sessions. (R. 364-71).

The claimant returned to CSMHC on March 12, 2012, and with Snead and Daphne Kendrick, a social worker, she created a treatment plan that included goals and objectives to be completed within a year. These plans included reducing the level, frequency, and intensity of anxiety; abstaining from substance abuse; reducing feelings of depression; and increasing her ability to handle stress. Records indicate that after this visit, the claimant visited CSMHC only two more times, once on April 10 and once on July 10. (R. 372-81).

On April 10, 2012, Dr. Lucas saw the patient at CSMHC and reported medication compliance with the medications prescribed to her on February 27, 2012. Dr. Lucas reported that the claimant was "stable" and her mental status examination returned entirely normal, consistent with results of past examinations completed during periods of medication compliance. Dr. Lucas diagnosed her with major depressive disorder, recurrent, severe, without psychotic features, and with generalized anxiety disorder. Dr. Lucas cancelled any outstanding prescriptions he had

14

written for the claimant and replaced them with prescriptions for Effexor XR and Trazadone. (R. 377-78).

On July 10, 2012, the claimant visited CSMHC for the last time and saw Dr. Lucas again. On this visit, the claimant's mental status examination was generally normal, but revealed an anxious mood, an irritable affect, and obsessive thought content. The record contained no explanation for these changes in status since the previous April 10 visit. Dr. Lucas again diagnosed the claimant as "stable," and he cancelled all previous prescriptions and replaced them with prescriptions for Ativan, Venafaxine, and Trazadone. The record contains no further records from CSMHC. (R. 379-80).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental security income, the claimant requested and received a hearing before an ALJ on October 15, 2012. (R. 20). The ALJ began the hearing by asking the claimant about her work history. The claimant testified that she had worked as a waitress, a retail cashier, a sales clerk, a receptionist, and a house cleaner. (R. 46-48).

The ALJ then questioned the claimant about her alleged health issues. The claimant testified that she faced unpredictable days of depression and loss of energy and that on these days she did not get out of bed, shower, answer the phone, or visit anyone. She claimed that sometimes these days occurred every other day, sometimes she experienced stretches of three or four such days in a row, and sometimes she went weeks without such a day. The claimant testified that these bad days occurred often enough to prevent her from consistently working. (R. 48-50).

The ALJ then questioned the claimant about her medication and treatment. The claimant

testified that she was taking Effexor, Ativan, and Trazadone and that she had been taking them for nearly a year. She stated that her doctor had tried other medications, such as Risperdal and BuSpar, but that these did not work. She claimed that her regular medication did not work well, but admitted that at times she did not take her medication for a while when she ran out.  She also admitted that she had self-medicated in the past when she was not taking her medication and not under the care of a psychiatrist or therapist, but stated that it had been over a year since she had self-medicated. The claimant stated that she had trouble getting her medication regularly in the beginning of 2011, but that at the time of the hearing she had worked those problems out and regularly took her medication. (R. 50-51, 53).

The claimant then testified about her living situation, stating that she was living in work release. She stated that she had previously lived with her parents, her sister, and her boyfriend, splitting time between the three households, but had moved out of her parents' home a few weeks before the hearing and returned to work release.[2] She was in work release because of unpaid fines from a DUI in 2008, and she claimed that she was planning on staying in work release for several months. (R. 51-52, 58).

The ALJ then asked the claimant about the status of her relationship with her family at the time of the hearing and about her interaction with the work release residents with whom she lived. The claimant explained that she saw her parents, sister, and children occasionally at their houses when the work release program granted her leave passes. Regarding the other residents, the claimant stated that she usually wore headphones all day listening to music or audio books to keep

---

[2] The record is not clear about when the claimant originally lived in the work release program; she simply testified that she asked to "return to work release" after moving out of her parents home.

from interacting with the other women. She also stated that she occasionally attended meetings for counseling, but only went to one-on-one counseling, not group sessions, because she could not stand to be around other people. (R. 54, 56).

The ALJ then addressed the claimant's alleged inability to work, asking the claimant what was keeping her from working. The claimant explained that the unpredictability of the bad days was the biggest problem inhibiting her ability to work in her opinion because she never knew how she was going to feel when she woke up each morning. She stated that these unpredictable days occurred even though her medication and treatment had been stabilized for almost a year before the hearing. The claimant also testified that her social phobia inhibited her ability to work, stating that she could not handle being in a group setting. Additionally, she stated that she was unable to go shopping because being around people made her angry, anxious, and stressed out. (R. 56-57).

The ALJ then asked the claimant about the periods when the claimant had worked since 2008, when she alleged that her disability began. The claimant explained that she had held a number of jobs as a waitress after the alleged disability date and that she was able to do this because of the flexibility of the job–on bad days she could get her shifts covered fairly easily and on good days she could cover other workers' shifts. She claimed, however, that her inability to come to work consistently and her occasional inability to find someone to cover her shifts resulted in her jobs as a waitress ending. (R. 59-60).

After questioning the claimant, the ALJ questioned vocational expert Dr. David Cosgrove. Dr. Cosgrove first explained to the ALJ the skill level and exertional level of each of the types of jobs that the claimant had previously testified to having. According to Dr. Cosgrove, the claimant's previously held jobs ranged from unskilled to semi-skilled and required either light or

sedentary exertion levels. (R. 60-61).

The ALJ then proposed two hypothetical scenarios to Dr. Cosgrove. In the first, he asked Dr. Cosgrove to testify if someone of the claimant's age (thirty-three) and with her education level (GED) could hold any of the jobs previously held by the claimant if that person were limited to simple, routine, repetitive tasks; could maintain attention and concentration to perform such tasks in two-hour increments; and could have occasional contact with others. Dr. Cosgrove testified that such a person could work as a housekeeper but could not hold any of the other jobs previously held by the claimant. Dr. Cosgrove then listed other jobs that could be held by such a person, including a garment sorter, a small product assembler, or a mail sorter. The ALJ asked how such jobs would tolerate unexpected absenteeism in light of the claimant's testimony regarding her unpredictable onsets of depression, and Dr. Cosgrove stated that missing a day to a day-and-a-half per month would be tolerated. (R. 62-63).

In the ALJ's second hypothetical scenario, he asked Dr. Cosgrove what job possibilities would be available to someone who was limited to simple, routine, repetitive tasks but could not maintain concentration and attention for two hours. Dr. Cosgrove testified that someone with these limitations would not be able to hold a job. (R. 63).

*The New Evidence*

On October 24, 2012, after the ALJ hearing but before the ALJ issued his decision, the claimant saw Dr. Alan Blotcky, a clinical psychologist who completed a consultative psychological evaluation. Dr. Blotcky reported that the claimant's mental status examination was generally normal, reporting a restricted affect, a sad anxious mood, and a slight vagueness in memory functioning. He also reported that the claimant looked tired and worn and that she had a

18

low energy level. Dr. Blotcky diagnosed the claimant with major depressive disorder, recurrent, severe, without psychosis, and with a social phobia and substance abuse, and he recommended that she be involved in psychiatric treatment on a regular and uninterrupted basis. He stated that she needed to be under the care of a psychiatrist and psychologists and that her treatment should include a combination of medication and individual counseling. (R. 381-87).

Dr. Blotcky filled out a Medical Source Opinion Form, reporting that the claimant had an extreme limitation in her ability to respond appropriately to customers or other members of the general public and an extreme limitation in her ability to maintain attention, concentration, or pace for periods of at least two hours. He reported that she had marked limitations in the following categories: ability to respond appropriately to supervisors and coworkers; ability to deal with changes in a routine work setting; ability to respond to customary work pressures; ability to maintain social functioning; and ability to maintain activities of daily living. (R. 381-87).

### *The ALJ's Decision*

On October 25, 2012, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 36). First, the ALJ found that the claimant had engaged in substantial gainful activity (SGA) since the alleged onset of her disability, but not continuously. The ALJ found that the claimant had average earnings in excess of that identified in the regulations as demonstrative of SGA during some months in 2008, and during the second and third quarters of 2010. He also found that during most of 2009 and during the first and fourth quarters of 2010, the claimant likely had average earnings in excess of that identified in the

regulations as demonstrative of SGA.[3] (R. 22-23).

The ALJ found that this work did not constitute an unsuccessful work attempt, was not sheltered, and that the claimant did not use the income for the purchase of necessary medical supplies or medicine. The ALJ explained that because the claimant had engaged in SGA after the alleged onset date but not continuously to the day of his decision, the disability analysis continued. However, he noted that the claimant's ability to engage in work at SGA levels or levels very near SGA levels for at least two years during the period the claimant claimed to have been disabled indicated that her alleged disabilities may not have been as severe as the claimant alleged. (R. 23).

Next, the ALJ found that the claimant had the following severe impairments: major depression, histrionic and borderline personality features, generalized anxiety disorder, social phobia, and a history of benzodiazepine/sedative hypnotic and marijuana abuse. However, the ALJ concluded that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the Medical Listings (20 C.F.R. Part 404, Appendix 1, Subpart P). The ALJ found that the claimant had the following limitations: mild restriction in activities of daily living; moderate difficulties in social functioning; and moderate difficulties with concentration, persistence, or pace. Because the ALJ found that the claimant did not have the required minimum of two marked limitations in these areas, he concluded that the claimant did not satisfy the "paragraph B" or "paragraph C" criteria of sections 12.04, 12.06, or 12.08 of the listings. (R. 23-25).

---

[3] In 2009, the average earnings indicative of SGA were $980.00/month, or $11,706/year. In 2009, the claimant earned an average of $925.48/month, totaling $11,105.74 for the year. In light of the claimant's testimony that "there were many times that [she] had to be out of work for two weeks to a month due to [her] condition," the ALJ concluded that the claimant likely had earnings in excess of $980.00/month for the months in 2009 when she did not have extended absences from work.

After considering the entire record available to him at the time, the ALJ found that the claimant had the residual functional capacity to perform a full range of work at all exertional levels, with the following nonexertional limitations: her work must be limited to simple, routine, repetitive tasks; her work must be limited to two-hour increments; and she may only be in occasional contact with others. (R. 25).

The ALJ found that, although the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent that they were inconsistent with the residual functional capacity assessment. The ALJ acknowledged that the evidence indicated that the claimant had a history of mental disorders that had, at times, resulted in inpatient treatment. However, the ALJ noted that these periods of treatment coincided with periods of the claimant's medication and treatment noncompliance. The ALJ pointed out that when the claimant was compliant with medication and treatment, her symptoms were generally remitted. (R. 27).

To support his conclusion, the ALJ summarized the claimant's medical records. The ALJ first discussed the claimant's first admission to Brookwood Medical Center on June 9, 2005, noting that laboratory testing during this visit revealed low levels of lithium consistent with medication noncompliance. However, the ALJ explained that after the claimant was treated with medication and a structured environment, a mental status examination of the claimant returned entirely normal.

The ALJ then pointed out that the claimant failed to show for several follow-up appointments with Dr. Schachter following her discharge from Brookwood, noting that when she

21

showed up in October 10, 2005, reporting severe anxiety, she admitted to not taking her medication. (R. 28).

The ALJ then discussed the claimant's treatment with Dr. Elizabeth Stevenson from January to July 2008. He noted that on the claimant's first visit with Dr. Stevenson on January 17, 2008, the claimant reported anxiousness and worry but also admitted once again that she had not taken her medication for six months. The ALJ discussed the various subsequent prescriptions that Dr. Stevenson prescribed, noting that the claimant told Dr. Stevenson multiple times that the medication was doing great. (R. 29).

The ALJ next explained that during the claimant's August 12, 2008, admission to Brookwood Medical Center, she admitted to not seeing a psychiatrist regularly for about four years. The ALJ pointed out that after seeing psychiatrist Dr. Joseph Lucas, and with proper medication during her stay at Brookwood, the claimant showed a positive response. However, the ALJ also noted that even with this psychiatric treatment and medication, the claimant was diagnosed with major depressive disorder, recurrent; generalized anxiety disorder; histrionic and borderline personality disorder; and sedative hypnotic abuse. (R. 29).

Next, the ALJ discussed the claimant's February 28, 2011, admission to Brookwood Medical Center, noting that the claimant again admitted to medication noncompliance and a failure to follow up on mental health treatment. The ALJ pointed out that the claimant once again responded well to medication and treatment with Dr. Schachter and was discharged from Brookwood on March 7, 2008, following an entirely normal mental status examination. The ALJ explained that during this visit, the claimant agreed to follow up with Dr. Schachter. However, the ALJ noted that the record indicated that the claimant may have only visited Dr. Schachter once, in

May 2011. (R. 29-30).

The ALJ then discussed two consultative evaluations of the claimant, one from clinical psychologist Dr. Robert Kline conducted on June 11, 2011, and one from State Agency psychiatric consultant Dr. Samuel Williams conducted on June 16, 2011. The ALJ noted that the claimant told Dr. Kline that her recent admission to Brookwood Medical Center had occurred because she had quit taking her medication, but that she restarted her medication and "things were working out pretty good again." (R. 30-31). The ALJ pointed out that Dr. Kline's mental status evaluation revealed generally normal findings, intact concentration and attention abilities, and no anxiousness, and he noted that Dr. Kline suggested that the claimant only had a mild restriction of activities, a mild constriction of interests, and a mild restriction in the ability to relate to others. (R. 30-31).

Turning to Dr. William's evaluation, the ALJ explained that Dr. Williams had reviewed the record and Dr. Kline's evaluation, and had concluded that the evidence did not support a finding of any severe mental impairment as defined by the regulations. The ALJ noted that Dr. Williams suggested that the claimant had only a mild limitation in social functioning; no limitations in daily activities; and no limitation in maintaining concentration, persistence, or pace. The ALJ also pointed out that Dr. Williams mentioned the correlation between the claimant's medication noncompliance and her negative symptoms. (R. 31).

The ALJ explained that while he gave the consultative evaluations of Drs. Kline and Williams considerable weight, he could not ignore the claimant's history of mental health issues and periods of inpatient treatment at Brookwood, whatever the reason for those issues may have been. He explained that even with the evidence of significant noncompliance coinciding with the

23

claimant's periods of worse symptoms, he did not agree with Dr. Kline's and Dr. Williams's conclusions that the claimant suffered from no medically determined "severe" mental impairments and that she suffered from either no limitations or only mild limitations. Rather, the ALJ explained that he found the claimant moderately limited in social functioning and moderately limited in concentration persistence and pace. (R. 31).

The ALJ then discussed the limited record of the period from the denial of the claimant's disability benefits on June 16, 2011, until the claimant's visit to Brookwood Emergency Room on January 12, 2012. Noting that the claimant did not return to her treating physician Dr. Schachter during this period, the ALJ inferred that the claimant quit taking her medication during this period, but did not cite anything to support this inference other than the claimant's failure to visit Dr. Schachter. The ALJ briefly discussed the claimant's January 12 admission to Brookwood, explaining that, according to the claimant, she had some problems with her medications while she was at work release that resulted in her getting increasingly upset until she was sent to the emergency room where she was diagnosed with acute depression. (R. 31-32).

The last portion of medical records the ALJ discussed were the records obtained from CSMHC, beginning February 27, 2012, and ending July 12, 2012. The ALJ noted that the claimant received prescriptions for Effexor XR, Trazadone, Vistaril, and Haldol on February 27, 2012, and that she visited psychiatrist Dr. Joseph Lucas on April 10, 2012, reporting compliance with her medication. The ALJ stated that Dr. Lucas's mental status examination of the claimant came back entirely normal, consistent with results of previous evaluations of the claimant during periods of medication compliance. The ALJ explained that the claimant next visited Dr. Lucas on July 12, 2012 again reporting medication compliance. However, the ALJ noted that the mental

status examination from this visit revealed an anxious mood, an irritable affect, and some obsessive thought content, and the ALJ stated that the record contained no explanation for the change in status since the April 10 visit. (R. 32-33).

The ALJ then discussed the weight given to the claimant's allegations in light of the other evidence in the record, explaining that the evidence did not support the claimant's testimony of the severity and intensity of her symptoms. The ALJ provided three reasons why he did not consider the claimant's allegations to be strong evidence in favor of finding disability. First, he stated that the allegations could not be objectively verified with any reasonable degree of certainty, but he did not explain this reasoning further. Second, he pointed out that the Function Report responses submitted by the claimant and her sister were provided after a long period of medication and treatment noncompliance. The ALJ stated that the symptoms and limitations alleged in these reports could have been the result of the noncompliance, pointing out that these reports were inconsistent with the Global Assessment of Functioning score of ninety that the claimant received from Dr. Schachter after a period of medication compliance. Third, the ALJ explained that even if the claimant did suffer limitations as severe as she alleged, he found it difficult to attribute such limitations to her mental impairments as opposed to other reasons; the ALJ did not specify these other reasons. Overall, the ALJ found that the claimant's testimony regarding her alleged limitations was outweighed by other factors in the record. (R. 33).

The ALJ then summarized his findings, pointing out that the record was replete with findings and observations of normal mental status examinations and reports from the claimant that she did well when compliant with medication and treatment. He explained that the evidence did not support the claimant's allegations of severe mental limitations during periods of compliance,

and stated that no evidence established that the claimant's abilities were so limited as to preclude work when she did comply with her medication. The ALJ noted that he found the claimant subject to some limitations as discussed above, and pointed out that these limitations were based on his giving deference to the claimant's allegations, because the record showed little to no deficit that would require such limitations if the claimant complied with her medication. The ALJ stated that the evidence showed that when the claimant complied with her medication, her ability to work was not so eroded as to find in favor of disability. (R. 33-34).

The ALJ then discussed the possible job opportunities for the claimant. He referenced Dr. Cosgrove's testimony and found that considering the claimant's age, education, work experience, residual functional capacity, and the nonexertional limitations the ALJ placed on the claimant's work, the claimant would be able perform her past relevant work as a housekeeper. The ALJ also noted that other jobs existed in significant numbers in the national economy that the claimant could perform, such as a garment sorter, a small products assembler, or a mail clerk/sorter. Therefore, the ALJ concluded that the claimant was not disabled. (R. 34-35).

The claimant properly requested  review of the ALJ decision through the Social Security Administration Appeals Council on November 7, 2012. The claimant submitted to the Appeals Council new evidence from consultative clinical psychologist Dr. Alan Blotcky, in the form of a psychological evaluation report completed on October 24, 2012. The Appeals Council summarily denied a review of the ALJ's decision on April 17, 2014, acknowledging receipt of the new evidence from Dr. Blotcky, but claiming that the evidence was not new and was already in the record. (R. 1-16, 382-87).

## VI. DISCUSSION

26

The claimant argues that the psychological evaluation report from Dr. Blotcky submitted and entered into the record as Exhibit 9F from October 24, 2012 constituted "new and material" evidence, and that the Appeals Council erred by failing to adequately consider the evidence and remand the case to the ALJ to reconsider in the light of the additional evidence. Pl.'s Br. 6-7. This court agrees and finds that the Appeals Council incorrectly concluded that the psychological evaluation report from Dr. Blotcky was already in the record and was not new.

When a claimant submits new and material evidence to the Appeals Council, and that evidence relates to the period on or before the date of the ALJ hearing, the Appeals Council must evaluate the new evidence along with the rest of the record on appeal. *See Keeton*, 21 F.3d at 1066. When a claimant takes issue with the adequacy of the Appeals Council's evaluation of new evidence, the district court may review the new evidence to see whether the Appeals Council should have considered the evidence. *Fry*, 209 F. Supp. 2d at 1252. The district court may determine that the failure of the Appeals Council to adequately consider the new evidence warrants a remand if a reasonable possibility exists that the new evidence would change the administrative outcome. *Flowers*, 441 F. App'x at 745.

In the instant case, in its denial of review dated April 17, 2014, the Appeals Council acknowledged receipt of the additional evidence from Dr. Blotcky but stated that the psychological evaluation report "[was] not new because it [was] an exact copy of Exhibit 9F, which [was] already in the record." (R. 2). The Appeals Council erred in this conclusion, because Dr. Blotcky's report was not in the record at the time of the ALJ's decision. The Exhibit List attached to the ALJ's notice of decision does not include Exhibit 9F; the last exhibit listed therein is Exhibit 8F. (R. 40). Furthermore, although Dr. Blotcky evaluated the claimant on October 24,

2012, he did not complete the report until October 30, 2012, five days after the ALJ issued his decision. (R. 36, 387). The record clearly shows that Dr. Blotcky's report was not in the record at the time of the ALJ's decision and that the Appeals Council erred in not considering the report to be "new."

Dr. Blotcky's report is also "material." It discusses the nature and severity of the claimant's mental impairments and supports her allegations in her hearing testimony, which the ALJ characterized in his decision as unsupported by evidence. Additionally, Dr. Blotcky's report, which states that the claimant has several marked or extreme mental limitations, contradicts Dr. Kline's and Dr. Williams's evaluations, which state that the claimant had at most mild mental limitations. This contradiction is significant because the ALJ noted in his decision that he only gave the opinions of Drs. Kline and Williams limited weight because of the claimant's history of mental health issues, her episodes of decompensation, and the diagnoses of the treating sources, which "[could not] be completely ignored."  (R. 31). If properly weighed and considered, Dr. Blotcky's report may lead the ALJ to give even less weight to the opinions of Drs. Kline and Williams, potentially changing his decision regarding the claimant's disability.

Further, Dr. Blotcky's report also contradicts the ALJ's finding that the claimant's impairments do not satisfy the "paragraph B" criteria of Section 12.04, 12.06, and 12.08 of the Medical Listings. The ALJ found that the claimant's mental impairments did not satisfy the "paragraph B" criteria because he found that the claimant did not have at least two limitations of marked severity in the required areas. (R. 24). Dr. Blotcky's report, however, states that the claimant has extreme difficulties in maintaining attention and concentration for at least two hours, marked restriction of activities of daily living, and marked difficulties in maintaining social

28

functioning. (R. 387). These limitations satisfy the "paragraph B" criteria.

Importantly, Dr. Blotcky's report came after the claimant had been complying with her medication for what appears to be several months. During the hearing, the claimant testified that she had worked out the problems she had in getting her medication and was regularly taking her medication at that time, and Dr. Blotcky's report does not indicate any medication noncompliance. In reaching his decision, ALJ found that most of the evidence indicated that the claimant's impairments were only severe during periods of medication noncompliance and that when the claimant complied with her medication and treatment, she did not suffer from the impairments to the degree that she alleged. (R. 27, 34). Dr. Blotcky's report contradicts the ALJ's finding and suggests that the claimant's impairments are as severe as alleged even after a period of medication compliance. In light of this new evidence, if the ALJ properly considers Dr. Blotcky's report, a reasonable possibility exists that this evidence could change the finding that the claimant is not disabled.

Finally, Dr. Blotcky's report is new evidence because it relates to the time period before the ALJ rendered his decision. *See Fry*, 209 F. Supp. 2d at 1253. Dr. Blotcky examined the claimant on October 24, 2012, and the ALJ rendered his decision one day later on October 25, 2012. (R. 36, 387).

For the foregoing reasons, this court finds that the Appeals Council erred by failing to properly consider the new evidence submitted by the claimant and for not remanding the case to the ALJ based upon that evidence. This case should be reversed and remanded pursuant to 42 U.S.C. § 405(g).

**VII. CONCLUSION**

For the reasons as stated, this court concludes that the decision of the Commissioner is due to be REVERSED AND REMANDED for reconsideration.

A separate order will be entered in accordance with the memorandum opinion.

DONE and ORDERED this 21st day of July, 2015.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE